```
                    UNITED STATES DISTRICT COURT
                       DISTRICT OF NEW JERSEY

DIEBOLD, INC.,                  :
                                :
          Plaintiff,            :   HONORABLE JOSEPH E. IRENAS
                                :   CIVIL ACTION NO. 07-1991 (JEI)
     v.                         :
                                :            OPINION
CONTINENTAL CASUALTY CO.,       :
                                :
          Defendant.            :
```

**APPEARANCES:**

ANDERSON KILL & OLICK, P.C.
By:  John N. Ellison, Esq.
     Luke E. Debevec, Esq.
1600 Market Street, Suite 2500
Philadelphia, Pennsylvania 19103
          Counsel for Plaintiff

CLAUSEN MILLER, P.C.
By:  Christopher Scanlon, Esq.
     Scott L. Schmookler, Esq.
One Chase Manhattan Plaza, 39th Floor
New York, New York 10005

and

COLLIAU ELENIUS MURPHY CARLUCCIO KEENER & MORROW
By:  Edward Delesky, Esq.
1249 South River Road, Suite 300A
Cranbury, New Jersey 08512
          Counsel for Defendant


**IRENAS**, Senior District Judge:

This dispute arises out of Defendant Continental Casualty Company's ("Continental") denial of insurance coverage to its policyholder, Plaintiff Diebold, Inc. ("Diebold").[1]  Presently

---

[1] The Court has subject matter jurisdiction based on diversity of citizenship, 28 U.S.C. § 1332.

before the Court is Continental's Motion to Dismiss, pursuant to Fed. R. Civ. P. 12(b)(6), the Amended Complaint.

For the reasons set forth below, the Motion will be granted in part and denied in part.

**I.**

Diebold services and replenishes ATM machines with money from banks and other financial institutions, often through subcontracts with armored car vehicle companies. Pursuant to contracts between Diebold and its ATM customers, the ATM customers entrusted monies to Diebold to be deposited in the ATM machines. In practice, however, the ATM customers often wired money directly to the armored car subcontractors who actually performed the cash replenishment. One of the armored car subcontractors Diebold used was Tri-State Armored Services, Inc. ("Tri-State").

> Under the cash replenishment arrangements between Tri-State and Diebold's ATM Customers, the ATM Customers would advise Tri-State of the amounts of currency to be placed in each of their ATMs and the schedule on which the replenishments were to take place. The ATM Customers would wire-transfer funds into the bank account for use by Tri-State in performing replenishments for Diebold's ATM Customers. Tri-State would withdraw the funds needed to perform the replenishments, have the funds converted to currency, place the currency in cassettes for loading into ATMs, and place the loaded cassettes into the ATM Customers' ATMs. When Tri-State placed the loaded cassettes into the ATMs, it removed the cassettes that were in the ATMs, which generally contained some remaining currency. This [remaining] currency is referred to as residual

>funds or 'residuals.'  Under Tri-State's
>replenishment arrangements with the ATM Customers,
>Tri-State was to return the residuals to the ATM
>Customers.  In order to achieve this, Tri-State
>would convey the [residual funds] cassettes back to
>Tri-State's vault location for emptying, counting
>and reconciliation against the ATMs' records of
>withdrawals since the previous replenishment, and
>thereafter would return the residual funds to the
>ATM Customers.

(Amend. Compl. ¶ 41).

Five Tri-State employees conspired to steal the money belonging to Diebold's ATM Customers, and, in 2001, they pleaded guilty to conspiracy, money laundering, and tax evasion charges. On March 1, 2001, Tri-State terminated its operations.  The next day it filed a Chapter 7 bankruptcy petition.

In March, 2003, Diebold filed a proof of loss with Continental setting forth "$8,992,038.33 as its potential loss" ("the Tri-State Loss")  (Amend. Compl. ¶ 48).[2]  Diebold further alleges that "[a]t the direction of [Continental], Diebold agreed to attempt first to recover the Tri-State Loss from Tri-State's fidelity insurance company, Great American Insurance Companies ("Great American").[3]  However, Great American succeeded in its bankruptcy court adversary proceeding to rescind Tri-State's insurance policy on account of Tri-State's equitable fraud in

---

[2] Diebold apparently made good any losses caused by its subcontractor, Tri-State, to Diebold's bank customers.

[3] *See generally, In re Tri-State Armored Services, Inc. (Great American Ins. Cos. v. Trustee)*, 332 B.R. 690 (Bankr. D.N.J. 2005), *aff'd* 366 B.R. 326 (D.N.J. 2007)(Irenas, S.J.).  The "Joint Loss Payable" endorsement to the Great American policy named Diebold as a "loss payee."  332 B.R. at 335-36.

3

procuring insurance coverage.[4]  On April 23, 2007, this Court affirmed the Bankruptcy Court's ruling.[5]

Around the same time (April, 2007), Diebold submitted another proof of loss for $6,730,832.61, which reflected the $2,038,640.58 that was received and distributed to Diebold customers through the bankruptcy court.

Diebold claims that Continental "refused to timely satisfy its obligation to Diebold, and has not yet even advised Diebold of its coverage position for the loss as of the date of this Complaint." (Amend. Compl. ¶ 67).  The Amended Complaint further alleges that Continental "has denied that a deferment of a receivable that is due and owing constitutes a sustained loss because '[Diebold] has not yet repaid its customers;'" and has also asserted that "Diebold 'may be unable to satisfy the Ownership provision of the policy,' because 'the money taken was not owned or held by [Diebold].  Rather, the various contracts and actual course of dealings between the banks and Tri-State show that the money was owned by the customers . . . and held by Tri-State.'" (Id. ¶¶ 71-72).  Diebold asserts that Continental's position directly contradicts repeated representations Continental made to Diebold assuring it that losses such as the Tri-State Loss would be covered under the policy.

Diebold's Amended Complaint asserts six counts: (1)

---

[4] *See supra*, n. 2.

[5] *See supra*, n. 2.

declaratory judgment "that [Continental] is obligated, in accordance with the [insurance policy], to provide insurance coverage for [Diebold's] claim;" (2) breach of the insurance policy; (3) breach of the duty of good faith and fair dealing / bad faith; (4) breach of fiduciary duty; (5) reformation of the insurance policy; and (6) misrepresentation.  Continental moves to dismiss each count of the Amended Complaint.

## II.

Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a complaint "for failure to state a claim upon which relief can be granted."  In considering a Rule 12(b)(6) motion, the Court accepts as true all of the factual allegations contained in the complaint and any reasonable inferences that can be drawn therefrom.  *Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir. 1996).  Dismissal of claims under Rule 12(b)(6) should be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  Although the Court must assume as true all facts alleged, "[i]t is not . . . proper to assume that the [plaintiff] can prove any facts that [are] not alleged."  *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

5

**III.**

Before reaching the merits of the present motion, the Court is faced with a choice of law issue. Continental asserts that Illinois law applies, while Diebold asserts that New Jersey law applies.[6]

This Court, sitting in diversity, applies New Jersey choice of law rules. *Klaxon v. Stentor Electric Mfg. Co.*, 313 U.S. 487 (1941). "Before a choice of law question arises . . . there must actually be a conflict between the potentially applicable bodies of law. Where there is no difference between the laws of the forum state and those of the foreign jurisdiction, there is a 'false conflict' and the court need not decide the choice of law issue." *Lucker Mfg. v. Home Ins. Co.*, 23 F.3d 808, 813 (3d Cir. 1994)(Becker, J.).

As will be apparent in this Court's discussion of each claim, New Jersey law and Illinois law do not materially differ with respect to the legal issues presented in the present Motion.

---

[6] Continental also suggests that Ohio law might apply to Diebold's claims. However, the Court holds that Ohio law does not apply. In determining which law to apply, New Jersey courts determine which state has a "dominant significant relationship," considering, among other factors, the place of contracting and the principal location of the insured risk. *Pfizer, Inc. v. Employers Ins. of Wausau*, 154 N.J. 187, 192-93 (1998); *NL Ind. v. Comm. Union Ins.*, 65 F.3d 314, 319-20 (3d Cir. 1995). In this case, the place of contracting was Illinois. Additionally, the theft occurred in New Jersey and Diebold asserts that New Jersey has a significant connection to this case because "[t]his case involves an attempt to recover money from a now-bankrupt New Jersey business and citizens predominantly from New Jersey banks and by extension, New Jersey banking customers." (Opp. Br. at 34). The only apparent connection Ohio has to this case is the fact that Diebold is incorporated in Ohio and has its principal place of business there. Moreover, while Continental argues that it should prevail under either Illinois, New Jersey, or Ohio law, it gives no explanation why Ohio law should apply.

Accordingly, the Court need not decide the choice of law question at this stage of the litigation.[7]

A.

Continental asserts two separate arguments why Counts 1 (declaratory judgment) and 2 (breach of contract) should be dismissed.  First, Continental argues that the claims are barred by the suit limitation clause contained in the insurance policy.  Second, Continental argues that Diebold's claim is not covered by the plain terms of the policy.  The Court will address each argument in turn.

(1)  The suit limitation clause

The policy states,

> No suit may be brought by an Insured seeking to recover under this Policy prior to the expiration of sixty (60) days after the written statement of claim[8] is filed with the Company, nor more than twenty-four months thereafter, except in the case of a loss based on a suit against an insured which contains allegations which, if established, would be a collectible loss under this Policy.  In that event suit may not be brought later than twelve (12) months after final resolution of the underlying action.  If any limitation embodies in this Policy is prohibited by any law controlling the construction hereof, such limitation shall be deemed to be amended so as to equal the minimum period of limitation provided by

---

[7] It is entirely possible that a true conflict between New Jersey and Illinois law may become apparent after the parties have engaged in discovery.  The Court merely holds that the choice of law question need not be answered in the context of this Fed. R. Civ. P. 12(b)(6) Motion.

[8] The parties use "proof of loss" and "statement of claim" interchangeably.

7

such law.

(Amend. Compl. Ex. A).  Continental reasons that Diebold's first statement of claim was submitted too late. Diebold submitted the first statement of claim in March 2003, but this suit was not filed until April 27, 2007.  Diebold asserts that the contractual time to sue was tolled, thereby rendering this suit timely under the policy's terms.

Both New Jersey and Illinois provide for tolling of the contractual period in which to sue.  New Jersey law provides that the period is tolled "between the time the insured gives notice of loss and the time the insurance company formally denies coverage."  *Azze v. Hanover Ins.*, 336 N.J. Super. 630, 637 (App. Div. 2001).[9]

Likewise, Illinois Insurance Code provides, "Whenever any policy or contract for insurance . . . contains a provision limiting the period within which the insured may bring suit, the running of such period is tolled from the date proof of loss is filed, in whatever form is required by the policy, until the date the claim is denied in whole or in part."  215 ILCS 5/143.1.[10]

---

[9] *See also Schneider Nat'l Carriers, Inc. v. Newport Dist. Servs., Inc.,* No. 04-5468, 2007 U.S. Dist. LEXIS 64147 at * 17-20 (D.N.J. Aug. 30, 2007)(Brown, J.) ("'The fair resolution is to allow the period of limitation to run from the date of the casualty but to toll it from the time an insured gives notice until liability is formally declined.'")(quoting *Azze*); *NN&R, Inc. v. One Beacon Ins. Group,* No. 03-5011, 2006 U.S. Dist. LEXIS 43109 at *27 (D.N.J. June 26, 2006)(Simandle, J.)("the limitations period is tolled between the time the insured gives notice of a loss and the time that 'liability is formally declined.'")(quoting *Azze*).

[10] *See, e.g., Harvey Fruit Market, Inc. v. Hartford Ins. Co. of Ill.,* 691 N.E.2d 71, 73 (Ill. App. Ct. 1998)(applying 215 ILCS 5/143.1, explaining, "Plaintiff's sworn statement, the format of which was in satisfaction of the

Applying either law, the allegations of the Amended Complaint are sufficient to support the conclusion that the policy's limitation period was tolled, and this suit is timely. Diebold asserts that it submitted a statement of claim in March, 2003, and that Continental "has not yet even advised Diebold of its coverage position for the loss as of the date of this Complaint." (Amend. Compl. ¶ 67). Thus, based on the allegations of the Amended Complaint, it appears that Continental has not yet formally denied coverage; therefore, the time in which to sue was tolled from March 2003 until the present. Accordingly, Continental's suit limitation argument fails.

(2)  <u>Coverage under the policy</u>

Continental also argues that the plain language of the policy precludes coverage for Diebold's claim. The policy states, "[Continental's] liability under this Policy shall apply only to Money, Securities, or Other Property owned by [Diebold] or held by [Diebold] in any capacity whether or not [Diebold] is legally liable." (Amend. Compl. Ex. A). Continental argues that the factual allegations of the Amended Complaint establish that Tri-State, not Diebold, "held" the money that was stolen, therefore there is no coverage for the loss.[11] Diebold asserts

---

policy's requirements, was submitted to defendant on May 24, 1983. Defendant denied the claim on December 12, 1983, thereby tolling the limitation period for 202 days.").

[11] Diebold does not dispute that it did not "own" the money. The parties agree that the ATM customers owned the money.

9

that it "held" the money in its capacity as a "bailee" for its ATM customers.

The issue is how to interpret the contract language, and whether extrinsic evidence may be used to determine the meaning of "held." Under New Jersey law, extrinsic evidence may be used to determine the intent of the parties with respect to the meaning of a contract term whether or not the term is ambiguous. *Conway v. 287 Corp. Center Assoc.*, 187 N.J. 259, 262 (2006).

Under Illinois law, "in determining whether an ambiguity exists the trial court may consider parole and extrinsic evidence." *The Home Ins. Co. v. The Chicago and Northwestern Transportation Co.*, 56 F.3d 763, 768 (7th Cir. 1995)(internal citations and quotations omitted). "[M]any Illinois cases have accepted the doctrine of 'extrinsic ambiguity' which entitles parties to present evidence outside of the contract to show that although the contract appears to be clear to a typical reader of English, anyone who understood the circumstances in which the contract had been intended to apply would know that it does not mean what it seems to mean." *Id.*

Applying either New Jersey or Illinois law, "held" is susceptible to more than one reasonable meaning, rendering that term ambiguous. Indeed, the parties' arguments that their proposed meaning is clear and supported by dictionary definitions, illustrates the point that more than one meaning could be reasonably ascribed to "held."

Continental cites Webster's Dictionary and Black's Law Dictionary defining "held" as, "to maintain possession of." Diebold, however, cites these same sources for another definition of "held": "to keep; to retain; to maintain authority over;" "to be the legal possessor of." According to the allegations of the Amended Complaint, Tri-State had physical possession of the money, and in that sense, "held" the money. However, Tri-State, as subcontractor for Diebold, carried out Diebold's direct contractual obligations to its bank customers to service the ATMs. Diebold argues that, as such, Diebold "held" the money by virtue of its contract with Tri-State. In that sense, Diebold reasons, it "maintained authority" over the money.

Diebold's Amended Complaint alleges various communications which, if proven true, could possibly support the conclusion that the parties intended a meaning of "held" which would apply to Diebold's situation with respect to the stolen money. For example, Diebold alleges that,

> On or about May 19, 2000, [Continental's Assistant Vice President] spoke with Carmen Keener of Marsh[12] and discussed the intent of the [policy]. Beranek expressed that he was amenable to making the [policy] excess in the event an armored car carrier's insurance policy is either exhausted or does not respond, and that the policy would address robbery and theft from a third-party contractor of Diebold servicing ATMs.

(Amend. Compl. ¶ 32). This allegation on its face is somewhat ambiguous. One could interpret it to mean that the policy did

---

[12] Marsh was Diebold's insurance broker. (Amend. Compl. Ex. B)

11

not, as written, cover a loss like the Tri-State Loss but could possibly be changed to effect coverage; or it could mean that the parties' negotiations did indeed result in an insurance policy which covered such a loss.  But what the allegation does establish, if proven true, is: (1) that the parties' negotiations at least addressed a situation where Diebold used subcontractors to service ATMs,[13] and (2) those negotiations took place years before the Tri-State thefts occurred.  The inquiry as to the parties' intent will thus be very fact-intensive, focusing on what the parties said and agreed to in negotiations.  Without the benefit of discovery, the Court cannot rule at this early stage of the litigation that Diebold will not be able to prove that the parties intended the Tri-State loss to be covered.[14]  Accordingly, Continental's Motion to Dismiss Counts 1 and 2 will be denied.

B.

Continental next argues that Count 3, "Breach of the Duty of Good Faith and Fair Dealing and Bad Faith" fails to state a

---

[13]  It appears clear that if Diebold had serviced the ATMs itself, and it was Diebold's employees that had stolen the money, there would be coverage under the policy.  The issue is whether the parties intended the same result if Diebold subcontracted out job of servicing the ATMs.

[14]  The Court's conclusion is further supported by New Jersey and Illinois law that instruct the Court to consider the "reasonable expectations" of the insured when interpreting insurance contracts.  *See Allen v. Metropolitan Life Ins. Co.,* 44 N.J. 294, 306 (1965); *State Farm Fire & Cas. Co. v. Leverton*, 732 N.E.2d 1094, 1098-99 (Ill. App. Ct. 2000).  The reasonableness of Diebold's expectation of coverage must be considered in light of the parties' negotiations.

claim.

Both New Jersey and Illinois recognize a bad faith action[15] in insurance cases. In New Jersey, "[t]o show a claim for bad faith, a plaintiff must show the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim." *Pickett v. Lloyd's*, 131 N.J. 457, 473 (1993). On the other hand, "if a claim is fairly debatable" there will be no liability. *Id.*

The Supreme Court of Illinois has held that 215 ICLS 5/155[16] "provides an extracontractual remedy to policyholders whose insurer's refusal to recognize liability and pay a claim under a policy is vexatious and unreasonable." *Cramer v. Ins. Exchange Agency*, 675 N.E.2d 897, 900 (Ill. 1996). An insurer's refusal to pay a claim is "vexatious and unreasonable" when there is "no bona fide dispute over coverage." *Mobil Oil Corp. v. Maryland*

---

[15] Both parties refer to Count 3 as a "bad faith" claim, accordingly, the Court will do the same.

[16] "(1) In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, other costs, plus an amount not to exceed any one of the following amounts: (a) 60% of the amount which the court or jury finds such party is entitled to recover against the company, exclusive of all costs; (b) $ 60,000; (c) the excess of the amount which the court or jury finds such party is entitled to recover, exclusive of costs, over the amount, if any, which the company offered to pay in settlement of the claim prior to the action."

13

*Cas. Co.*, 681 N.E.2d 552, 561 (Ill. App. Ct. 1997).[17]

The allegations of the Amended Complaint are sufficient to state a claim under either New Jersey or Illinois law. Diebold asserts that Continental wrongfully denied coverage and acted in bad faith by, among other things, "engagement in unreasonable, frivolous, or untenable denial of benefits to Diebold," "assertion of coverage positions that are contrary to the accepted customs and practices of the insurance industry," and "assertion of coverage positions during claims handling that are different from the coverage positions asserted during underwriting." (Amend. Compl. ¶ 100). These facts, if proven true, would establish that Diebold's entitlement to coverage under the policy was not "fairly debatable," and there could be no "bona fide dispute over coverage." Continental's Motion to Dismiss Count 3 will be denied.

C.

With respect to the breach of fiduciary duty claim, (Count 4), Continental argues that no such cause of action by an insured against its insurer exists under either New Jersey or Illinois law. While Diebold concedes that "Illinois law does not

---

[17] *See also, Citizens First Nat'l Bank v. Cincinnati Ins. Co.,* 200 F.3d 1102, 1110 (7th Cir. 2000) ("an insurer's conduct is not vexatious and unreasonable if: (1) there is a bona fide dispute concerning the scope and application of insurance coverage; (2) the insurer asserts a legitimate policy defense; (3) the claim presents a genuine legal or factual issue regarding coverage; or (4) the insurer takes a reasonable legal position on an unsettled issue of law.")(citations to Illinois caselaw omitted).

14

recognize a policyholder's cause of action against its insurance company for breach of fiduciary duty," it argues that such a claim exists under New Jersey law. The New Jersey cases Diebold cites, however, only establish that an insurer's breach of fiduciary duty gives rise to a bad faith claim. *See, e.g., Pickett,* 131 N.J. 457, 469 (1993)("Most jurisdictions have characterized a cause of action for bad-faith failure to pay an insured's claim as a tort *that arises out of* the implied duty of an insurance company to deal fairly and act in good faith in processing the claims of its policyholder.")(emphasis added). Breach of fiduciary duty, in the context of an insured's suit against its insurer for alleged wrongful denial of coverage, is not an independent tort. Indeed, Diebold's Amended Complaint labels the bad faith claim as "Breach of the Duty of Good Faith and Fair Dealing and Bad Faith."

Because an independent cause of action for breach of fiduciary duty does not exist under either New Jersey or Illinois law, Count 4 shall be merged with Count 3, "Breach of the Duty of Good Faith and Fair Dealing and Bad Faith;" and Continental's Motion to Dismiss Count 4 will be denied.

D.

In Count 5, Diebold seeks "reformation of the [policy] to reflect the agreement reached by the parties." Continental asserts that this claim should be dismissed for Diebold's failure

15

to comply with the suit limitation provision of the policy. For the reasons explained *supra* at subsection III., A., 1, the Court holds that, based on the facts alleged in the Amended Complaint, this suit is not untimely. Continental's Motion to Dismiss Count 5 will be denied.

### E.

Lastly, Count 6 alleges that Continental made "intentional, reckless, accidental, or negligent . . . incorrect statements, omissions and/or failed to correct inaccurate statements concerning Diebold's coverage . . . during the course of negotiation of the [policy]." The Amended Complaint further alleges that Diebold justifiably relied on Continental's statements during their negotiations, and specifically, Diebold alleges that it relied upon Continental's representations about how the policy would "apply to claims arising out of circumstances like the Tri-State Conspiracy." Continental asserts that the allegations do not establish a misrepresentation claim. Diebold argues it has stated a claim for common law fraud and negligent misrepresentation under both New Jersey and Illinois law.

The elements of common law fraud are identical in New Jersey and Illinois: (1) a material misrepresentation; (2) knowledge of falsity by the defendant; (3) intent for plaintiff to rely on the misrepresentation; (4) reasonable reliance of the plaintiff; and

(5) resulting damages to the plaintiff.  *See Liberty Mut. Ins. Co. v. Land,* 186 N.J. 163, 174-75 (2006)*; Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 591 (Ill. 1996).  The Amended Complaint asserts that: Continental knew that Diebold was seeking insurance coverage for situations where armored car companies were handling the ATM money; Continental represented to Diebold that thefts like the Tri-State incident would be covered but Continental never intended to pay for such a loss; and Diebold purchased insurance based on those representations.  Accordingly, Count 6 states a claim for common law fraud under either New Jersey or Illinois law.

On the other hand, the Amended Complaint fails to state a claim for negligent misrepresentation under either New Jersey or Illinois law.

The Restatement (Second) of Torts § 552, generally followed by both New Jersey and Illinois,[18] states,

> Information Negligently Supplied for the Guidance of Others
>
>   (1)  One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he

---

[18]  *See People Express Airlines v. Consol. Rail Corp.,* 100 N.J. 246, 256-57 (1985); *Zurad v. Lehman Bros. Kuhn Loeb, Inc.*, 757 F.2d 129, 133 (7th Cir. 1985)(applying Illinois law); *Johnson Bank v. George Korbakes & Co.*, 2005 U.S. Dist. LEXIS 16069 (N.D. Ill. 2005); *Cahill v. Eastern Ben. Systems, Inc.*, 236 Ill. App. 3d 517, 522 (Ill. App. Ct. 1992).

17

>    fails to exercise reasonable care or competence in obtaining or communicating the information.
>
>    (2) . . . the liability stated in Subsection (1) is limited to loss suffered
>
>    (a)  by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
>
>    (b)  through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

(emphasis added).

In discussing negligent misrepresentation cases, the New Jersey Supreme Court has observed,

>    Importantly, the cases do not involve a breach of contract claim between parties in privity; rather, they involve tort claims by innocent third parties who suffered purely economic losses at the hands of negligent defendants with whom no direct relationship existed. Courts have justified their finding of liability in these negligence cases based on notions of a special relationship between the negligent tortfeasors and the foreseeable plaintiff who relied on the quality of defendants' work or services, to their detriment. The special relationship, in reality, is an expression of the courts' satisfaction that a duty of care existed because the plaintiffs were particularly foreseeable and the injury was proximately caused by the defendant's negligence.

*People Express Airlines v. Consol. Rail Corp.*, 100 N.J. 246, 256-57 (1985) (emphasis added). As *People Express* discusses, common negligent misrepresentation cases include suits by third-party, non-clients against independent auditors, attorneys,

18

architects, and notaries public.  *Id.* at 284.[19]

Diebold and Continental, both of which has substantial bargaining power, had a direct contractual relationship with one another.  Diebold is not a non-contracting third party, as generally contemplated by the Restatement, who might foreseeably rely on a misrepresentation by Continental, yet not be expected to independently evaluate such misrepresentation.  Diebold merely claims that Continental assured it that a loss, such as the Tri-State theft, would be covered.  While this allegation may be relevant to Diebold's claim that Continental fraudulently promised to provide coverage with no intention of actually doing so, or it may be relevant in determining the expectations of the parties when they agreed to the policy, it is not a proper legal basis for a negligent misrepresentation claim against Continental with whom Diebold had a direct contractual relationship. Accordingly, the negligent misrepresentation claim will be dismissed.

---

[19] *See generally,* Restatement (Second) of Torts, comment h, illustration 4 ("A, having lots for sale, negligently supplies misinformation concerning the lots to a real estate board, for the purpose of having the information incorporated in the board's multiple listing of available lots, which is distributed by the board to approximately 1,000 prospective purchasers of land each month. The listing is sent by the board to B, and in reliance upon the misinformation B purchases one of A's lots and in consequence suffers pecuniary loss. A is subject to liability to B.").

**IV**.

For the reasons stated above, Continental's Motion to Dismiss will be denied except with respect to the negligent misrepresentation claim encompassed by Count 6 of the Amended Complaint.  Additionally, Count 4, "Breach of Fiduciary Duty," shall be merged with Count 3, "Breach of the Duty of Good Faith and Fair Dealing and Bad Faith."  The Court will issue an appropriate order.

Date: April 10, 2008

                                                s/ Joseph E. Irenas
                                          JOSEPH E. IRENAS, S.U.S.D.J.