UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

DIEBOLD, INC.,                  :
                               :
        Plaintiff,             :      HONORABLE JOSEPH E. IRENAS
                               : CIVIL ACTION NO. 07-1991 (JEI / JS)
     v.                        :
                               :              **OPINION**
CONTINENTAL CASUALTY CO.,       :
                               :
        Defendant.             :


**APPEARANCES:**

ANDERSON KILL & OLICK, P.C.
By:  John N. Ellison, Esq.
     Luke E. Debevec, Esq.
1600 Market Street, Suite 2500
Philadelphia, Pennsylvania 19103
             Counsel for Plaintiff

CLAUSEN MILLER, P.C.
By:  Christopher Scanlon, Esq.
     Scott L. Schmookler, Esq.
One Chase Manhattan Plaza, 39th Floor
New York, New York 10005

and

COLLIAU ELENIUS MURPHY CARLUCCIO KEENER & MORROW
By:  Edward Delesky, Esq.
1249 South River Road, Suite 300A
Cranbury, New Jersey 08512
             Counsel for Defendant


**IRENAS**, Senior District Judge:

     This is an insurance coverage dispute between Plaintiff

Diebold, Inc. ("Diebold"), the insured, and Continental Casualty

Company ("Continental"), the insurer.[1]    Presently before the

_____

     [1]  The Court exercises diversity of citizenship subject
matter jurisdiction pursuant to 28 U.S.C. § 1332.

Court are the parties' motions for summary judgment.

     For the reasons set forth below, summary judgment will be granted to Continental on the basis of its "discovery" affirmative defense.  Diebold's corresponding cross-motion for summary judgment will be denied.  The Court also grants Continental's Motion for Summary Judgment on Diebold's bad faith claim.  Both Continental's and Diebold's motions for summary judgment regarding all other issues will be dismissed as moot.


## I.

*Diebold and Tri-State Armored Services, Inc.*

     Diebold contracts with various banks and credit unions to service ATM machines.  In 1992, Diebold introduced its "Fastline" service, consisting of "two separate and distinct ATM service pieces": "non-technical fixes, such as clearing paper jams and card jams," and "cash replenishment" of the ATM machines, i.e., physically loading and unloading cash from the machines. (Continental Ex.[2] 50)  While Diebold itself performed the non-technical fixes, it subcontracted out to armored car carriers the cash handling portion of the Fastline service.

     The loss at issue in this case has its origins with one of Diebold's subcontractors, Tri-State Armored Services, Inc. ("TSA").  Several TSA employees, including Barry Chesla, TSA's

---

     [2]  "Continental Ex." refers to exhibits attached to Continental's Motion for Summary Judgment.

CEO and secretary, and William Mottin, TSA's president and treasurer, were convicted of various criminal charges in connection with TSA's mishandling of bank customers' cash.  In a related suit, the Bankruptcy Court found that

> [f]rom the commencement of Tri-State's business in October 1997 through on or about March 1, 2001, when Tri-State closed its doors and terminated operations, Tri-State never made a profit. . . . The company routinely comingled the funds of the various financial institutions which it served, both in its wire account and its cash vault.  Funds from one bank would routinely be used to service the ATMs of another bank.
>
> . . .
>
> . . . Within a month of its formation, the company began to make unauthorized 'borrowings' from its wire account and cash vault to pay operating expenses, notwithstanding the fact that the money belonged exclusively to customers and was required to be used only to replenish ATM machines.

*Great American Ins. Cos. v. Ch. 7 Trustee (In re: Tri-State Armored Services, Inc.)*, 332 B.R. 690, 699-700 (Bankr. D.N.J. 2005).[3]


*Diebold and Continental*

Diebold's contracts with its bank customers stated that Diebold would not be liable for losses caused by its armored carriers while money is in transit or at the carrier's vault. (See, e.g., Continental Ex. 3)  But Diebold nevertheless made the business decision to compensate its customers, in the form of

---

[3]  Affirmed by 366 B.R. 326 (D.N.J. 2007) (Irenas, S.D.J.).

3

deferred receivables and product credits, for losses caused by TSA.  (Continental Ex. 50; Fortune Affidavit ¶¶ 14-15)[4]

Diebold first sought to recover its loss from TSA's insurer, Great American Insurance Companies.  However, Great American succeeded in its lawsuit to rescind TSA's insurance on the basis of equitable fraud.  *See Great Am. Ins. Cos.,* 366 B.R. at 332.

Diebold now seeks to recover its losses from Continental under the parties' Commercial Crime Policy.

The insurance policy states, in relevant part,

> This company shall be liable for direct loss of Money . . . caused by . . . disappearance or Theft while . . . in the care and custody of an armored vehicle company.
>
> . . .
>
> This bond applies to actual or potential loss discovered by an Insured during the Policy Period. Discovery occurs when the Risk Management Department of the Insured . . . first becomes aware of facts which would cause a reasonable person to assume that a loss of a type covered by this bond, without regard to the amount[,] has been or will be incurred, regardless of when the acts or acts causing or contributing to such loss occurred, even though the exact amount or details of loss may not then be known. This includes receipt of notice of an actual or

---

[4]  With respect to Diebold's decision to not "enforce" the "exculpatory" clause of its contracts with the banks, Jack Fortune, Diebold's Risk Manager for the Fastline program, testified, "[w]e know what our obligations are to the banks and we didn't feel that the language would necessarily hold up.  We didn't want to get a rash of lawsuits that we might lose. . . . And we felt that the insurance that we were addressing with [TSA's insurance carrier] Great American would come up with the necessary funds.  And if that didn't happen, we would look to . . . [Continental] for whom we had secured insurance for this very purpose."  (Fortune Dep. at p. 183)

> potential claim in which it is alleged that an Insured
> is liable to a third party under circumstances which,
> if true, would constitute a loss under this bond.
>
> There is no coverage under this bond for any loss
> caused by a wrongdoer after discovery of an actual or
> potential loss caused by that wrongdoer.

(Amend. Compl. Ex. A)

Diebold filed its Proof of Loss with Continental on March 6, 2007 (three days after this Court affirmed the Bankruptcy Court's decision in *Great American*) asserting that it discovered the TSA loss on March 2, 2001 (i.e., the day TSA filed for bankruptcy). Diebold seeks to recover approximately $5.8 million dollars from Continental.[5]


*Facts and circumstances in the years prior to March 2, 2001*

The documentary record demonstrates that large "shortages" or "out-of-balance" conditions arose with ATMs serviced by TSA as early as 1998.[6]  On January 20, 1998, Sharonview Federal Credit

---

[5]  As Diebold's Proof of Loss explains, Diebold customers (the banks) received compensation for a portion of their losses through TSA's bankruptcy.  (Continental Ex. 1)  Diebold seeks to recover the difference between the total alleged loss and the amount already recovered, plus legal fees through November 2006.  (Id.)

[6]  Jack Fortune explained at his deposition that when a bank claims a shortage or an out-of-balance condition with its ATM, it is asserting that money cannot be located, i.e., the money has been "lost" either while in the ATM itself (for example, when an ATM dispenses $20 bills when it should have been dispensing $10 bills) or while in the possession of the cash handler.  (Fortune Dep. at p. 32-34) "Most out-of-balance conditions are not true shortages."  (Id. at p. 33)  Therefore, the Fastline managers investigated every out-of-balance claim "to establish, is it truly a loss or is it somewhere in the paperwork?"  (Id.)  Until an

Union wrote to Diebold regarding "Cash Shortage- New Jersey Cash Dispensers." (Continental Ex. 22)  The letter stated, "Diebold should reimburse Sharonview Federal Credit Union . . . $102,075.00 currently being held by [TSA] as a direct result of funds removed by them from Sharonview's Cash Dispensers, from the period August 1, 1997 - December 31, 1997." (Id.)  There is no evidence in the record regarding how this claim was resolved.

Then on March 31, 1998, Sharonview wrote to TSA President William Mottin (carbon copying three Diebold managers) concerning a "serious problem with our cash account currently serviced by [TSA]." (Continental Ex. 23)  The letter went on to request TSA's payment of $32,075.00, which, the letter indicates, TSA agreed was is its possession, and requested TSA's cooperation in locating $68,540.00 in "unaccounted funds." (Id.)  The letter also stated that Sharonview was "very concerned about the delay that has occurred in the resolution of this matter." (Id.) There is no evidence in the record about whether this letter was related to the previous Sharonview letter.  There is also no evidence in the record concerning the resolution of this claim.

In 1999, the problems with TSA continued.

––––––––––––––––––––

investigation was completed, Diebold considered all out-of-balance and shortage claims "potential losses" to the company, in the sense that if the investigation revealed a true loss, Diebold would then compensate their bank customer.  (Id. at p. 64)
    While various documents in the record appear to use "out-of-balance" and "shortage" interchangeably, the Court will only use "shortage" to refer to a true loss of money, not situations where an out-of-balance situation is reconciled and the money is found (or determined to be never truly missing in the first place).

On April 22, 1999, Automated Technology Machines Incorporated ("ATMi") wrote to both TSA and Diebold formally requesting reimbursement of $4,400.00. (Continental 2 Ex.[7] 13) The letter states, "[TSA] cannot provide ATMi with any balancing receipts from the ATM . . . . Therefore, we cannot determine if there is a discrepancy in the ATM totals." (Id.)  There is no evidence in the record concerning the resolution of this claim.

On May 12, 1999, NIH Federal Credit Union wrote to Diebold concerning "several unexplained settlement differences" occurring in ATMs serviced by TSA. (Continental Ex. 26)  The letter reported that NIH met with TSA to discuss the differences, that TSA returned $27,240.00 to NIH and agreed that an additional $13,975.00 was "their responsibility." (Id.)  NIH also requested that Diebold reimburse them $67,420.00 for other "differences" that TSA claimed were Diebold's responsibility. (Id.)

Just a month later, on June 15, 1999, NIH wrote Diebold again about "several unexplained settlement differences [that] continue to occur." (Continental Ex. 27)  The letter stated,

> [s]ince [our May 12, 1999 letter] we have 3 additional large shortages. . . . **Previously reported shortages of $67,420.00 bring the total shortage to $119,570.00!** We expect to see immediate action on this issue! . . . We have taken all necessary means to research these differences.  Please consider this a claim for shortages as described above.

(Id.) (boldface type in original).

---

[7] "Continental 2 Ex." refers to exhibits attached to Continental's Opposition to Diebold's Motion for Summary Judgment.

Jack Fortune responded to these letters on July 1, 1999:

Your letters of 5-12-99 and 6-15-99 regarding ATM shortages have been referred to me for reply and action.

As we discussed during our telephone conversation yesterday, Diebold and Tri-State are actively investigating the shortage claims detailed in your letters. Ms. Debra Ward, Fastline Manager in Charlotte, will have primary responsibility for the investigation. In support of her efforts, in addition to her immediate staff, Diebold will employ the services of an outside investigator from Chicago. . . .

I stated in our conversation that Diebold will send a check to you for all of the 1999 claims within 10 days. This amounts to $81,860. . . .

(Continental Ex. 28)

Also during 1999, Diebold reimbursed four banks for

shortages caused by TSA:

- On October 8, 1999, Jack Fortune approved a $950.00 check to Crestar Bank. (Continental 2 Ex. 27) The accompanying memorandum explains, "Diebold . . . attempted to have [TSA] send a check directly to [Crestar]. [TSA] is responsible for cash replenishment and deposits. Due to the delay waiting for [TSA] to act, [Diebold is] going to send the customer a check and deduct from the [TSA] invoice." (Id.)[8]

- On October 25, 1999, Jack Fortune approved a $170.00 check to Fredericksburg Savings Bank for "Reimbursement For [TSA's] Error." (Continental Ex. 40)

- On November 12, 1999, Jack Fortune approved a

---

[8] The accompanying letter from Crestar bank indicates that in addition to the missing cash, a $843.38 check was also missing from the ATM machine at issue. (Continental 2 Ex. 27) But the bank was able to stop payment on the check and reissue it, thereby obviating the need for reimbursement. (Id.)

8

$2,380.00 check to One Valley Bank for "Cash shortage[s] on ATMs" that occurred from January, 1999 through July, 1999.  (Continental Ex. 41)  The internal memorandum accompanying the check request reads, "[p]lease approve the attached check request in the amount of $2,380.00. . . .  The cash vendor, [TSA], has reimbursed One Valley for $1,600.  I am planning to recover at least half if not all of the $2,380 from [TSA]."  (Id.)

- On December 27, 1999, Diebold wrote to National Bank of Sussex County verifying that an ATM shortage of $800 did exist for the period March 22, 1999 through June 26, 1999.  (Continental Ex. 36)  Fastline Operations Manager Arben Arifaj wrote, "I will request that a check be sent to you . . . to reimburse your organization for the loss.  For your information, we have not discovered any unauthorized entry to the ATM, so that Diebold in turn will send a claim to our vendor, [TSA]."  (Id.)

Complaints from banks continued in 2000.  On February 2, 2000, Maryland Permanent Bank wrote to Diebold about the "numerous problems" the bank experienced with TSA.  (Continental 2 Ex. 14)  The bank's Vice President wrote, "I have never dealt with such an incompetent and inept group of people.  What concerns me most is taking [TSA's] word for many of the shortages."  (Id.)

Then, according to Diebold's own internal memorandum,[9] "[s]torm clouds began gathering over [TSA] in May of 2000." (Continental Ex. 50)

On May 5, 2000, Philadelphia Federal Credit Union ("PFCU")

---

[9]  Jack Fortune drafted the memorandum for Diebold's senior management, including Diebold's president and vice president, sometime after TSA filed for bankruptcy.  (Fortune Dep. at p. 168)

wrote to Diebold with a "detailed list of continuous [TSA] errors" beginning in 1999 and continuing apparently unremedied, to the present.  (Continental 2 Ex. 9)  Those repeated errors included missing deposit envelopes and missing or erroneous settlement paperwork.  (Id.)  Arben Arifaj forwarded PFCU's letter to Bill Mottin at TSA, writing, "[e]ven if 20% of their comments are accurate, there are problems here."  (Id.)

Then on May 31, 2000, the FBI contacted Arben Arifaj concerning their investigation of Barry Chesla.  (Continental Ex. 44)  That same day, Arifaj wrote Jack Fortune an email:

> It appears that the FBI has been performing an extensive investigation on M. Barry Chesla. . . . In their visit to [TSA's] Ligonier [Pennsylvania] facility they did interview several [TSA] employees and according to the agent– they were made aware of some serious lapse [sic] in control.

> When specifically asked about Bill Mottin, [TSA's] principal stake owner, [the agent] specifically stated that they did not have any case built against him at this time.  It appears that this investigation was part of the investigation that I made you aware of last October.[10]

> An alarming item is that the agent mentioned that there is a rough sum of about $2-5 mln [sic] dollars that they feel may have been taken by Mr. Chesla– however– they are not clear about the source of the funds, etc.

> By coincidence I am at [TSA's] Ligonier facility tomorrow and I will be performing our annual audit. However the agent had suggested an actual cash audit (not only Ligonier, but the other facilities as well).  Since most of [TSA's] accounts are done on a

---

[10]  There is no record evidence concerning this October communication.

wire basis this complicates the issue severely.

By this email I wanted to make you aware of the situation.  I will be calling you tomorrow to discuss this matter further so that we can take some more progressive steps.

(Continental Ex. 44)

Then on July 10, 2000, Jack Fortune approved a $31,000.00 check to SunTrust Bank for "TriStates [sic] Shortages- 1999." (Continental Ex. 30)  The accompanying internal memo states, "[p]lease approve the attached check request for SunTrust Bank in the amount of $31000.00.  My intentions are to withhold this sum from the [TSA] invoice payment as I had discussed with you on June 23.  This amount represents 2/3 of the remaining outages for 1999. . . ."  (Id.)

SunTrust continued having problems with TSA in 2000.  Twice in July, 2000, SunTrust wrote to Diebold detailing out-of-balance conditions that occurred in over 20 TSA-serviced ATMs in May and June, 2000. (Continental Exs. 29, 30)  The total amount of cash at issue was $717,680.  (Id.)

On August 23, 2000, the FBI held a teleconference with Diebold.  (Continental Ex. 45)  George Kula's[11] handwritten notes from that teleconference recorded the following:

- "an ongoing investigation by the FBI and IRS turned up some indication of internal embezzlement at [TSA] that could exceed $15-

_____

[11] George Kula was Diebold's Director of Internal Audit. (Fortune Dep. at p. 133)  He passed away prior to this suit's filing.  (Id.)

11

16 million since 1997"

- "[TSA] has never made money in its history. The embezzlement was to support the operating expenses of the business."

- "[FBI agent] Steve [Francke] needs a loss established, banks are not complaining– he has no victim."

(Id.)

Five days later, on August 28, 2000, Diebold service representatives met with First Citizens Bank to "verbally recommend a move away from [TSA] based on our suspicions and an FBI investigation." (Continental Ex. 49)

On August 29, 2000, the FBI met with Diebold again, this time with Assistant United States Attorney Dennis Kissane. (Continental Ex. 46)  Kula's sparse notes from that meeting include the following:

- "In Grand Jury– some info not shared"

- "'loan from vault' as liability on B/S[12]"

- "vault shortfall– we maybe [sic] victims but we cannot reconcile.  Could we balance all 62 customers simultaneously[?]"

- "Bad Signs– one pool of cash[;] instances where wires back have not been timely"

- "our plan should be to move customers away from [TSA]"

(Continental Ex. 46)

A.U.S.A. Kissane recorded his recollection of this meeting

---

[12]  "B/S" apparently is an abbreviation for "balance sheet." (Fortune Dep. at p. 142-43)

in a letter:

> A meeting was held on August 29, 2000 at the FBI office in Atlantic City, New Jersey between representatives of Diebold, three FBI and IRS/CI agents from Pittsburgh and FBI agents from Atlantic City. At that time the investigators' concerns about embezzlement at [TSA] were strongly stated, and Diebold again was requested to conduct an audit.
>
> Diebold's responses to the information were: (a) to emphasize the great difficulty of conducting an audit of [TSA] because [TSA] had numerous other non-Diebold customers . . . ; and (b) a second response was to begin to not renew ATM servicing contracts with [TSA] and to gradually transition Diebold customers away from [TSA] for ATM servicing.

(Continental Ex. 47)

Just two days after the FBI meeting in Atlantic City, Jack Fortune requested[13] a $129,820.00 check to First Union National Bank. (Continental 2 Ex. 33) Fortune's handwritten note accompanying the request reads, "It <u>absolutely</u> was an inside job. Either a Diebold or [TSA] employee (or former employee) stole the money [from the ATM in Limerick, Pennsylvania.] The investigation is ongoing, but First Union is tired of waiting and wants their money now. [TSA] is splitting, so our actual loss is 65K." (Id.)

On August 31, 2000, William Mottin stepped down as TSA's President, although he remained an employee of the company. *In re Tri-State*, 332 B.R. at 702.

---

[13] Jack Fortune needed approval from his supervisor because of the size of the check. (See generally, Fortune Dep. at p. 44-45, 59, 61-62)

13

During September, 2000, amid Diebold's "growing concerns," Diebold continued to move its customers away from TSA. (Continental Ex. 50)

In October, 2000, Diebold received a subpoena from the FBI requesting copies of contracts between Diebold and its customers using TSA from September, 1997 forward.  (Continental Ex. 50)

That same month, Jack Fortune also approved a $3,475.00 check to Sandy Spring National Bank of Maryland.  (Continental 2 Ex. 25)  It may be inferred that TSA was determined to be responsible for the shortage, as it paid Diebold $3,475.00 for "Sandy Spring National Loss Compensation."  (Id.)

On November 6 and 7, 2000, Diebold and First Union National Bank[14] jointly conducted an audit of TSA's vault in Hammonton, New Jersey.  (Continental Ex. 51)  On November 6, 2000, the audit revealed that $721,150.00 was missing from First Union's segregated cash vault.  (Id.)  When Diebold and First Union returned the next day, TSA had identified the missing money.  An internal Diebold report states,

> [TSA's] explanation was that the Fed delivery on Monday, 11/6/00, was late in coming and the vault had been in a hurry and had 'mixed up' the funds.  Again appearances would lead all to believe that First Union funds were used to load other institutions [ATM] canisters and the money returned to First Union's inventory after the Fed delivery.

---

[14]  First Union was originally a Diebold customer.  However, when Diebold began to move its customers away from TSA in 2000, First Union chose to end its relationship with Diebold and began contracting directly with TSA.  (Fortune Dep. at p. 132-33)

(Id.)

In December, 2000, Diebold approved two more reimbursements to customers claiming losses caused by TSA:

- Jack Fortune approved a $11,200.00 check to Summit Bank.[15] (Continental Ex. 37) The accompanying email states, "[t]he cash handler, [TSA], will be held responsible for 100% of the reimbursement amount due to the circumstances of each claim." (Id.)

- Jack Fortune approved a $4160.00 check to Atlantic Bank in connection with "missing funds" at an ATM location where TSA transported the bank deposits. (Continental Ex. 38) The accompanying email states that half of the $4160.00 will be withheld from TSA's invoices. (Id.)

F & M Bank also wrote to Diebold in December, 2000, about TSA's "pattern of poor service and shoddy workmanship" including improper balancing of ATM machines and out-of-balance conditions of $3,280 and $500.  (Continental 2 Ex. 15)

In January, 2001, United National Bank wrote to TSA (carbon copying Diebold) detailing numerous ATM settlement problems from November, 2000, to the present, including a $15,880.00 settlement difference for the period November 16, 2000 through December 14, 2000. (Continental Ex. 39)

On February 9, 2001, Michael Dowling, Diebold's Regional Service Manager wrote an extensive letter to TSA regarding "extremely important customer issues that require immediate

---

[15]  By the time TSA filed for bankruptcy, Summit Bank had merged with Fleet National Bank.  (Continental 2 Ex. 3)

attention and action." (Continental Ex. 43) The letter details complaints from M&T Bank, United National Bank, SummitBank and Ocean City Home Bank regarding missing wire transfers and vault mismanagement. (Id.) The letter also references the potential for "legal action" taken by United National Bank and Ocean City Home Bank. (Id.)

Finally, on February 26, 2001, Diebold "fired" TSA (Continental Ex. 50), and on March 2, 2001, TSA filed a Chapter 7 bankruptcy petition.

*The instant suit*

Diebold's Amended Complaint asserts six counts: (1) declaratory judgment that the TSA loss is covered under the Commercial Crime Policy; (2) breach of contract; (3) breach of the duty of good faith and fair dealing / bad faith; (4) breach of fiduciary duty; (5) reformation of contract; and (6) "misrepresentation." The Court's prior opinion and order deciding Continental's Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6) merged Counts 3 and 4 into one claim, and dismissed Count 6 to the extent that it asserts a claim for negligent misrepresentation. *See Diebold, Inc. v. Continental Casualty Co.*, No. 07-1991, 2008 WL 1372948 (D.N.J. April 10, 2010).

Among other things, both parties move for summary judgment on the issue of whether the discovery clause of the Commercial Crime Policy quoted *supra* at page 4, precludes coverage.

16

Continental also moves for summary judgment on Diebold's bad faith claim.  Because the Court will grant Continental's Motion with respect to these two issues, the Court need not reach the other issues raised by the pending motions.[16]

**II.**

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).  In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party.  *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).  The role of the Court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The summary judgment standard is not affected when the

---

[16]  Diebold's reformation (Count 5) and misrepresentation (Count 6) claims are alternative claims in the event the Court held that there was no coverage for the TSA loss under the "Ownership" provision of the Commercial Crime Policy.  Because the Court holds that Diebold is not entitled to coverage regardless of the interpretation of the Ownership provision, those claims are now moot.

parties file cross-motions for summary judgment.  *See Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987).  Such motions "'are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.'"  *Transportes Ferreos de Venez. II CA v. NKK Corp.*, 239 F.3d 555, 560 (3d Cir. 2001) (quoting *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968)).  If after review of cross-motions for summary judgment the record reveals no genuine issues of material fact, then judgment will be entered in favor of the deserving party in light of the law and undisputed facts.  *Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 302 (3d Cir. 1998).

## III.

### A.

Continental argues that Diebold is not entitled to coverage because all of the "Claimed Funds"-- the money Diebold identified in its Proof of Loss (Continental Ex. 1)-- came into TSA's possession after Diebold "discovered" an actual or potential loss caused by TSA.  The relevant portion of the Policy reads: "[t]here is no coverage under this bond for any loss caused by a

18

wrongdoer after discovery of an actual or potential loss caused by that wrongdoer."  (Amend. Compl. Ex. 1)  "This bond applies to actual or potential loss discovered by an Insured during the Policy Period.  Discovery occurs when the Risk Management Department of the Insured . . . first becomes aware of facts which would cause a reasonable person to assume that a loss . . . has been or will be incurred . . . even though the exact amount or details of loss may not then be known."  (Id.)

Three sub-issues are raised.  First, when did the Claimed Funds come into TSA's possession?  Second, when did "the Insured first become aware of facts that would cause a reasonable person to assume that a loss . . . has been or will be incurred"?  Third, which Diebold employees are encompassed by the term "Risk Management Department," as that term is used in the Policy?  Each issue is addressed in turn.[17]

---

[17]   The Court already engaged in a full choice of law analysis at the motion to dismiss stage, and chose New Jersey law, reasoning that the events giving rise to the loss occurred primarily in New Jersey. See Diebold, Inc. v. Continental Casualty Co., 2008 WL 2645471 at *3 (D.N.J. July 8, 2008) ("Diebold (the insured) does have a connection with New Jersey in that it is seeking indemnification for payments it made to New Jersey banks for money that a now-bankrupt New Jersey company stole.  To the extent that applying New Jersey law helps to facilitate, albeit somewhat indirectly, compensation of New Jersey victims, New Jersey has the greater interest in having its law apply, than Illinois has in having its law apply.")  At summary judgment, Continental argues that the Court should revisit that ruling, in light of record evidence that the insurance contract negotiations took place in Illinois and Ohio.  It argues the Court should apply either Illinois or Ohio law, without choosing between the two.  Diebold asserts that the prior choice of law ruling should stand.
   The prior ruling only decided the choice of law issue as to tolling of the suit limitation clause in the insurance contract.

**1.**

To understand the issue with regard to when the Claimed Funds came into TSA's possession, a brief explanation of Diebold's Proof of Loss is in order.  Diebold constructed its Proof of Loss from the proofs of claim its bank customers filed in TSA's bankruptcy case.  As Diebold's Proof of Loss clearly sets forth, Diebold seeks to recover the difference between each bank's claimed loss and the amount each bank received through the bankruptcy.[18]

---

No one seeks to relitigate that issue at summary judgment.  Because the choice of law analysis is issue-specific, it is possible for the Court to rule that Illinois or Ohio law applies to the issues raised on summary judgment.  However, the same considerations supporting the Court's prior ruling are relevant to the choice of law issue presented here.  Nothing in the record indicates that either Ohio or Illinois have any other connection to this case other than being the places where the parties negotiated the insurance contract.  Nothing in the record indicates that either Ohio or Illinois could possibly be the principal location of the insured risk.  *See Diebold*, 2008 WL 2645471 at *2 ("'the law of the principal location of the risk governs unless another state has a more significant relationship;'" quoting *Pfizer, Inc. v. Employers Insurance of Wausau*, 154 N.J. 187, 190 (1998)).

Also, Continental argues for applying Ohio or Illinois law without identifying any specific conflict between the law of those states and the law of New Jersey.  When the parties do not argue that a conflict exists, or the Court determines that no true conflict exists, New Jersey courts apply New Jersey law.  *See Curtis T. Bedwell and Sons, Inc. v. Geppert Bros., Inc.*, 655 A.2d 483, 395 (App. Div. 1995).  Accordingly, following *Geppert Bros.*, the law of the forum applies.

[18]   First Union appears to be the one exception.  The loss Diebold seeks to recover in connection with First Union is money (in the form of product credits) Diebold paid to settle First Union's lawsuit against Diebold, not the difference between First

Nineteen individual banks are listed on the Proof of Loss. With respect to 15, the corresponding proof of claim and supporting documentation identify the date the claimed debt was incurred, i.e., when TSA came to possess the claimed funds.

Susquehanna Bancshares, Inc.'s proof of claim is a simple example.  (See Continental Ex. 3)  On the bankruptcy court's standard proof of claim form, box number 2 is entitled "Date debt was incurred."  Susquehanna wrote "February 2001" in box 2.  Its supporting documentation demonstrates that on February 20, 2001 and February 23, 2001, TSA collected, but never returned, $111,860.00 and $23,530.00 respectively, from two of Susquehanna's ATMs.  Similarly, on February 23, 2001, Susquehanna sent a $256,000.00 wire to TSA but the cash was never loaded into the designated ATM.  Thus, Susquehanna filed its proof of claim for $391,390.00 ($111,860.00 + $23,530.00 + $256,000.00).[19]

Of the 15 proofs of claim that identify the date TSA came to possess the claimed funds, First Citizens Bank's proof of claim bears the earliest date: October, 2000.  (Continental Ex. 3)[20]

_____

Union's proof of claim and the amount it received through TSA's bankruptcy.  (Fortune Affidavit ¶ 14)

[19]  According to Diebold's Notice of Claim, Susquehanna received $118,544.55 through the bankruptcy, resulting in Diebold's claim of $272,845.45 for its reimbursement of Susquehanna Bank.

[20]  Nine of the 15 proofs of claim list February, 2001, as the date the debt was incurred.  This is consistent with Jack Fortune's testimony that TSA's "performance began to deteriorate dramatically" in February, 2001.  (Fortune Dep. at p. 165)

Four of the 19 banks listed on the Proof of Loss, however, did not specify a date when their claimed debt was incurred. For example, box 2 of Fleet National Bank's proof of claim reads, "[a]ctual date of theft unknown, discovered approximately February, 2001." (Continental Ex. 3)

With respect to all 19 banks, Diebold argues that Continental has put forth no admissible evidence of when the banks' funds came into TSA's possession, therefore summary judgment must be denied on Continental's discovery affirmative defense. The Court disagrees.

With respect to the 15 banks that did identify a date when TSA's debt was incurred, the proofs of claim themselves are arguably inadmissible hearsay.[21]  However, when Diebold constructed its own Proof of Loss based on the information the banks provided in their proofs of claim, it effectively adopted as true the information contained in the proofs of claims.[22] After relying on such information, and submitting it to Continental in support of its Proof of Loss, Diebold cannot now argue that Continental is precluded from relying on the information included in the proofs of claim.

With respect to the four banks for which loss dates cannot

_____

[21]  The Court need not definitively decide the issue. Rather, the Court will assume without deciding that the proofs of claim would be inadmissible at trial.

[22]  Diebold's Proof of Loss is admissible as an admission by a party-opponent. Fed. R. Evid. 801(d)(2).

be determined, a different problem is presented.  Diebold is correct that, as to these four banks, there is no record evidence as to when the Claimed Funds came into TSA's possession.  Diebold further argues that because Continental has the burden of proof on this issue, and because it has failed to produce any evidence in this regard, Continental's motion for summary judgment must be denied.  The flaw in Diebold's reasoning however, lies in confounding the burden of *persuasion* with the burden of *producing evidence* (also called the burden of going forward).

The burden of persuasion is "a party's duty to convince the fact-finder to view the facts in a way that favors that party." Black's Law Dictionary (8th Ed. 2004).  The burden of production is "a party's duty to introduce enough evidence on an issue to have the issue decided by the fact-finder, rather than decided against a party in a peremptory ruling such as summary judgment." Id.  Stated another way, "[t]he burden of production is the obligation to make a prima facie case, i.e., to introduce evidence sufficient as a matter of law to enable a rational fact finder to find that particular proposition of fact is true." Corpus Juris Secundum, Evidence § 189.  Thus, "[t]he burden of persuasion becomes a crucial factor only if the parties have sustained their burdens of producing evidence."  2 McCormick on Evidence § 336 (6th Ed.)

The Court concludes that based on the particular facts of this case, and New Jersey law, the burden of production with

regard to the timing of TSA's possession of the Claimed Funds is
most appropriately placed on Diebold.

The New Jersey Supreme Court's decision in *Griggs v.
Bertram*, 88 N.J. 347 (1982) provides guidance.  In *Griggs*, the
insured settled a lawsuit without the participation of his
insurance company, who had wrongfully disclaimed liability
coverage.  88 N.J. at 365.[23]  The insurer argued that it should
not be liable for the settlement amount because the settlement
was unreasonable and made in bad faith.  *Id.*  The trial court
held, and the Appellate Division agreed, that the insurer had
both the burden of persuasion and the burden of production as to
the unreasonableness of the settlement.  *Id.*  The Supreme Court
reversed an remanded on this issue, explaining,

> In approaching the [burden of proof] inquiry, great
> weight must be placed upon the character of an
> insurance policy as a contract of adhesion. . . . It
> is equally important to emphasize that an insurance
> contract is preeminently one of the utmost good faith.
> Since we are dealing with rights that derive from a
> contract of adhesion, which the insurer, as the
> dominant party, must honor as a fiduciary, it is
> entirely appropriate that the ultimate burden of
> persuasion should rest with the insurer. . . .
>
> That does not mean, however, that it is fair or
> practical to require the carrier also to assume the
> burden of producing evidence.  The insured would have
> had control of the [underlying] case and the
> opportunity for discovery as to all essential
> information.   The circumstances surrounding the

---

[23]   The underlying suit was a personal injury suit arising out
of a physical altercation between two teenaged boys outside of a
school basketball game.  *Griggs*, 88 N.J. at 352-53.  The insured
was one of the boys involved in the fight.  *Id.*

settlement and the operative evidential facts as to
its reasonableness and good faith are known to the
insured.  Knowledge of these facts and circumstances
would not ordinarily be in the possession of the
carrier, which was not a participant in the settlement
negotiations.  Thus, the insured, without undue
hardship or fundamental inequity, can best marshall
the basic facts relating to the settlement.  Further,
requiring the insured initially to produce proofs
concerning the settlement gives the insured the
procedural incentive to identify the critical issues
and relevant evidence.  It will apprise the insurer of
the nature of the insured's claim and will remove
speculation or guess work as to what will be material
in terms of the reasonableness and fairness of the
settlement.  To the extent that the relevant issues
are established and clarified and material evidence is
adduced, both parties stand to benefit.  Additionally
placing the initial burden of production on the
insured will adequately serve to protect the carrier
from having to pay a settlement reached through
collusion between the insured and the injured third
party or which is otherwise unreasonable and the
product of bad faith.

By imposing upon the insured the burden of production
or going forward with relevant evidence, a settlement
which the insured has not shown by the initial
production of proof to be *prima facie* reasonable in
amount and untainted by bad faith would, of course, be
unenforceable.  Since, however, the insurer by its
unfair dealing has imposed upon the insured the full
burden of protecting [his] own interests and has
placed [him] in the difficult predicament of
attempting on [his] own to secure the benefits of
insurance under the policy, the insurer should not be
freed from the ultimate responsibility to pay.  It
should, therefore, be required to sustain the ultimate
and major burden of demonstrating, by a preponderance
of the evidence, that it is not liable because the
settlement is neither reasonable nor reached in good
faith.

We therefore hold that a settlement may be enforced
against an insurer in this situation only if it is
reasonable in amount and entered into in good faith.
The initial burden of going forward with proofs of
these elements rests upon the insured and the ultimate
burden of persuasion as to these elements is the

responsibility of the insurer.  This rule reasonably accommodates and compromises the competing interests of the parties and considerations of public policy.

*Griggs,* 88 N.J. 347, 367-68 (1982).

In this case, the parties agree, and the Court agrees, that the burden of persuasion properly rests with Continental to prove, by a preponderance of the evidence, that there is no coverage under the last sentence of the Commercial Crime Policy's discovery clause.

However, with respect to the issue of when the Claimed Funds came into TSA's possession, *Griggs'* reasoning supports placing the initial burden of production on Diebold.  Just as the insured, and not the insurer, would have knowledge of the facts and circumstances surrounding settlement negotiations in *Griggs*, in this case, Diebold is far more likely to know, or have superior access to, facts relevant to when TSA came to possess the Claimed Funds.  Indeed, Diebold's own forensic accounting expert in this case, Alfed Giuliano, was the same expert to TSA's Chapter 7 Trustee and was also retained as an expert in TSA's suit against its insurer, Great American.  (Diebold Ex. RR) Further, even without Mr. Guiliano, Diebold is in a better position to get information from its own clients, the banks, as to when money was wired to TSA or when shortages occurred.[24]

_____

[24]  This may be particularly true with regard to First Union. While the Court does not know the details of the litigation between it and Diebold, if the parties engaged in discovery before settlement, presumably Diebold would have (or could have) obtained

Continental, on the other hand, would not have nearly the same access to relevant information.  Therefore, just as the New Jersey Supreme Court in *Griggs* concluded that placing the burden of production on the insured would not cause undue hardship or fundamental inequity, this Court concludes the same in this case.[25]

Because the initial burden of production belongs to Diebold, in opposing Continental's Motion for Summary Judgment, Diebold cannot merely rely on the absence of record evidence as to loss dates for the remaining four banks.  In order to avoid summary judgment, Diebold must at least make a prima facie showing that the loss dates occurred before the operative discovery date.  It has not done so.

In summary, with respect to the dates when the Claimed Funds came into TSA's possession, the Court concludes: (1) as to the 15 banks for which the record provides loss dates, that evidence is admissible; and (2) as to the 4 banks for which there is no record evidence regarding a loss date, Continental's Motion for Summary Judgment does not fail for lack of evidence (and Diebold's Cross-Motion for Summary Judgment does fail) because

_____

such information during discovery.

[25]  This conclusion as to the balance of equities between the parties is further strengthened by the record evidence that the insurance contract at issue here was not a contract of adhesion but rather the product of extensive negotiations between sophisticated parties.

Diebold bears the initial burden of production on this issue.

## 2.

Of the Claimed Funds, the earliest loss established by the record is the First Citizen's Bank loss, which occurred in October, 2000.  Thus, October, 2000 becomes the operative date for the discovery analysis: prior to October, 2000, was Diebold aware of sufficient facts that would cause a reasonable person to assume that a covered loss had occurred?  Based on the factual record, a factfinder could only answer, "yes."

Diebold met with the FBI twice in August, 2000.  The record is clear about the information that was given to Diebold at that time.  Contrary to Diebold's assertions, the FBI provided sufficient information from which to conclude that the FBI's investigation was not solely limited to Barry Chesla.  Indeed, multiple documents in the record only support the conclusion that the FBI made Diebold aware that it might be a "victim" of TSA's "internal embezzlement" and Diebold was strongly urged to conduct an audit.  (See Continental Ex. 46, 47)  George Kula's notes leave no doubt; the FBI told Diebold that they had reason to believe that TSA was taking "loans" from its cash vault to support its failing business.

Even after the first of the FBI meetings, Diebold began to move its customers away from TSA "based on [its] suspicions and an FBI investigation."  (Continental Ex. 49)  And Diebold

continued to move its customers away from TSA through September, 2000.

Moreover, by August, 2000, Diebold had already reimbursed two of its customers, NIH Federal Credit Union and SunTrust Bank, for three atypically large out-of-balance conditions[26], and reimbursed four other banks for out-of-balance conditions connected to TSA.

Thus, the information Diebold received from the FBI in August, 2000, combined with what Diebold already knew with regard to bank reimbursements-- could only lead a reasonable person to conclude that a potential loss had been or would be incurred.  A reasonable factfinder could only conclude that Diebold "discovered" the TSA loss prior to October, 2000.

### 3.

Diebold strenuously argues that all of the above is irrelevant because the parties do not dispute that Mark Tucker, Diebold's Director of Risk Management (i.e., head of the "Risk Management Department") was not contemporaneously aware of the FBI meetings or the reimbursements.  More to the point, Diebold

---

[26]  Jack Fortune testified that it was "not typical" "to have instances where Diebold would be making payments to customers between 10- and $20,000."  (Fortune Dep. at p. 45)  Specifically with respect to the first NIH out-of-balance condition of approximately $67,000, Fortune testified that it was not in the "typical" range for out-of-balance conditions at the time. (Fortune Dep. at p. 56)

argues that Jack Fortune, who attended at least one of the August, 2000 FBI meetings and approved the reimbursements, is not part of Diebold's "Risk Management Department" as that term is used in the Commercial Crime Policy.  The Court is unpersuaded by this argument.

It is undisputed that Jack Fortune's formal title during the relevant time period was Manager of Risk Analysis.  It is also undisputed that Fortune was in the Service Department, not the Risk Management Department.  However, the factual record is clear that Fortune, not Tucker, was the person responsible for analyzing risk as it related to the Fastline Service.

With respect to the creation of Fortune's position, Tucker testified,

> [t]o explain Jack's function, when we started into [the cash replenishment component of the Fastline Service] I worked with management and others within Diebold to protect Diebold's exposures from a risk standpoint.  That was going to require somebody on a full-time basis within the operation to carry forward those protections, precautions and to make sure that we are minimizing the risk of those losses.  That's when they brought Jack Fortune into the service operations to help manage their risk from these cash losses.
>
> . . .
>
> He was managing the risk of . . . the [Fastline] service, based on criteria we set up.

(Tucker Dep. at p. 86)

Tucker's testimony also demonstrates the practical division of responsibility between himself and Fortune:

30

Q:   The relationship between Diebold and [the cash
     handler] subcontractors, was that memorialized in
     a written contract?

A:   Typically that's a question for Jack Fortune.  He
     is the one who managed that side of things.

. . .

Q:   Are you familiar with the standard contract
     service agreement you use in connection with cash
     handlers?

A:   I'm knowledgeable of some mechanism that Jack
     Fortune is using, but that's a Jack Fortune
     issue.

Q:   In your view of risk manager of Diebold, are the
     contractual provisions between you and your
     customers part of the risk management strategy
     that the company employs?

A:   No.  From a business standpoint, *Jack Fortune
     would be working with management and legal to
     deal with the issues of the cash handlers.*  My
     efforts, from a risk management and a risk
     control standpoint, is [sic] to make sure that
     [the cash handlers] are following some guidelines
     to make sure that there is not a high . . .
     opportunity for loss to occur. . . .

     *So my risk management role would be in a broader
     scale*, to make sure that we are using cash
     handlers with wherewithal and risk management
     techniques to prevent the loss or minimize the
     risk of loss. . . .

(Tucker Dep. at p. 39-41) (emphasis added).

     Moreover, the documentary evidence demonstrates that Fortune

was the individual responsible (or jointly responsible) for

authorizing reimbursements to Diebold's bank customers.  He, not

Mark Tucker, was also the person responsible for drafting a

comprehensive memorandum to Diebold's senior management detailing

the events and circumstances leading up to Diebold firing TSA and TSA's bankruptcy.  (See Continental Ex. 50)

Based on these facts, to hold that Diebold may avoid the discovery clause merely because Mark Tucker did not contemporaneously know of the facts outlined in Section III. A. 2. *supra*, when Jack Fortune undisputedly did, would be an absurd result.  The Court will not hold Continental's discovery defense meritless based on the mere corporate formality of Jack Fortune, *Manager of Risk Analysis for the very service sought to be insured under the Commercial Crime Policy*, being placed in Diebold's Service Department rather than the Risk Management Department.  Therefore, the Court concludes that the term "Risk Management Department" as used in the Commercial Crime Policy, encompasses Jack Fortune, based on the undisputed facts demonstrating Fortune's function as Manager of Risk Analysis.

Because Diebold does not dispute that Fortune was contemporaneously aware of the facts outlined in Section III. A. 2. *supra*, the Court holds that Diebold's Risk Management Department was aware of facts that would lead a reasonable person to conclude that a potential loss had been or would be incurred. Accordingly, Continental is entitled to summary judgment on Counts 1 (declaratory judgment) and 2 (breach of contract) of the Amended Complaint based on its "discovery" defense, and Diebold's cross-motion must be denied.

**B.**

Lastly, Diebold's bad faith claim (merged Counts 3 and 4 of the Amended Complaint) requires only brief discussion.  To the extent Diebold's bad faith claim is based on Continental's alleged wrongful denial of coverage, that claim fails because the Court holds that there is no coverage for the TSA loss.  However, Diebold's bad faith claim also apparently rests on allegations that Continental: (1) failed to fully investigate the claim; (2) failed to provide Diebold with its "coverage position" until after Diebold filed suit; and (3) has asserted defenses in this suit that it never raised until after litigation began.  Diebold asserts that these bad faith claims are, as a matter of law, independent from any coverage dispute.  In other words, Diebold argues that it can still prevail on a bad faith claim even though this Court holds that the TSA loss is not covered under the Commercial Crime Policy.

The Court must reject Diebold's argument.  "Courts construing New Jersey law have indicated that finding of coverage under the insurance policy is a predicate to a bad faith claim." *On Air Entertainment Corp. v. National Indemnity Co.*, 210 F.3d 146, 153 n.11 (3d Cir. 2000) (citing *Hudson Universal, Ltd. v. Aetna Ins. Co.,* 987 F. Supp. 337, 342 n.3 (D.N.J. 1997)); *see also Robeson Industries Corp. v. Hartford Accident & Indemnity Co.*, 178 F.3d 160, 167-69 (3d Cir. 1999) (rejecting insured's argument that "New Jersey law allows for the imposition of tort

liability against an insurer for bad faith even when the insured was not entitled to coverage under the policy.").[27]

Contrary to Diebold's assertions, *Pickett v. Lloyd's*, 131 N.J. 457 (1993), does not support its bad faith claim insofar as it is independent from the coverage dispute. *Pickett's* holding, stated at the very outset of the opinion, is clear: "[w]e hold that [New Jersey] law does recognize a [bad faith] cause of action *when the failure to pay the policy results from a denial or withholding of benefits for reasons that are not even debatably valid* . . . ." *Id.* at 461 (emphasis added). More succinctly, the *Pickett* court held that "the law impose[s] on an insurer the duty to act in good faith *in paying claims* to its insured." *Id.* at 466 (emphasis added). *Pickett* simply did not involve a bad faith claim where, as here, there is no coverage under the policy.

While *Pickett* does broadly state that an insurer has a fiduciary duty of good faith in processing claims, such statements must, of course, be read within the context of the facts of the case, which are materially different from the facts of this case. Perhaps there is a persuasive argument for expanding the fiduciary duty identified in *Pickett* to encompass a

---

[27] Continental argues that Illinois law should apply, however, Illinois law also does not recognize a bad faith claim absent coverage under the policy, *see Prisco Serena v. Liberty Mutual*, 126 F.3d 886 (7th Cir. 1997), therefore, following *Geppert Bros.,* 655 A.2d at 395, the Court applies New Jersey law. *See supra* n. 17.

claim for bad faith even in the absence of coverage, but it is not for this Court to make such an expansion, especially in the face of contrary Third Circuit precedent.

Accordingly, Continental is entitled to summary judgment on Diebold's bad faith claim.


## IV.

For the reasons stated above, Continental's Motion for Summary Judgment on the "discovery" issue will be granted. Diebold's cross-motion on that issue will be denied. Continental's Motion for Summary Judgment on Diebold's bad faith claim will also be granted.  The motions for summary judgment on all other issues will be dismissed as moot.  The Court will issue an appropriate order.


Date: June 21, 2010


                    s/ Joseph E. Irenas
                JOSEPH E. IRENAS, S.U.S.D.J.


35